UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KYLE DeHART,

                Petitioner,

        v.                                    CAUSE NO. 3:21-CV-957-RLM-MGG

WARDEN,

                Respondent.

OPINION AND ORDER

Kyle DeHart, a prisoner without a lawyer, filed an habeas corpus petition to challenge his conviction for felony murder and obstruction of justice under Case No. 43C01-1503-MR-2. Following a jury trial, 0the Kosciusko Circuit Court sentenced him to 110 years of incarceration on October 26, 2016.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence presented at trial:

> DeHart was born in 1992. He and Woody went to high school together and were close friends. DeHart and Hursey were incarcerated together in 2013 and 2014 and became "really close" during that time. Hursey got to know Woody in early 2015 and "accepted him because he was DeHart's friend." On February 18, 2015, the three men spent most of the day together. They also spent time with Jacob Larkin, who had bought an eighth of an ounce of "really good" marijuana from Thornburg earlier that day. The four men went to DeHart's house and smoked some of Larkin's marijuana. They drove around, dropped Larkin at his house, and

returned to DeHart's house. Hursey went into a room on the ground floor, and DeHart and Woody went upstairs. They came downstairs about twenty minutes later, and DeHart told Hursey that they were "trying to go pick up some weed." DeHart also said, "Just so you know we don't intend on paying for these trees," i.e., the marijuana. According to Hursey, "it was established that DeHart and Woody planned on rolling Thornburg. So basically talk her out of her weed, promise to pay her and later not do it." Unbeknownst to Hursey, DeHart and Woody also planned to bind Thornburg with duct tape and slit her throat.

The trio drove to Thornburg's house and arrived around midnight. DeHart saw Knisely's vehicle parked outside and said, "Old boy's here." Woody replied, "I ain't worried about him." The three men walked through an alley to the door. DeHart was carrying a black bag containing a roll of duct tape and a utility knife. Woody knocked on the door. Thornburg, who had dated Woody in high school, let them in and led them to an upstairs room where Knisely was sleeping on a bed. Thornburg and her three visitors sat down and smoked marijuana. Woody asked Thornburg how much marijuana she had. She told him "somewhere around an ounce, maybe a little more." Woody said, "I want it all." She asked him if he had "the money to cover that," and he said, "Yeah, no problem." Thornburg weighed out an ounce of marijuana, put it in a plastic bag, and gave it to Woody. Woody gave the bag to DeHart and "winked at him." Thornburg asked for the money. Woody said, "It's out in the car, you know, I gotta go get it." Thornburg said, "You're not going to do this to me Brandon."

Woody removed one of his gloves, revealing a latex glove underneath. He then took a nine-millimeter handgun out of his sweatpants, stood up, and pulled back the slide. Thornburg started "screaming telling him he ain't gonna do this, he's not gonna do this." Hursey and DeHart "jumped up simultaneously." Woody punched Thornburg and shot her in the face. Hursey saw her fall "backwards motionless" in her chair. He also saw that Knisely was "awake in the bed now." Hursey and DeHart ran downstairs to the car. Woody shot Knisely in the back of the neck, killing him instantly. Woody got into the car, and DeHart drove off. Woody told Hursey that if he "ever said anything about what he just saw he was going to get the same thing they just got." DeHart threw his shoes out the car window and "made the comment it's trash day tomorrow," so Woody dropped his handgun in a trash can en route to DeHart's house.

When they arrived at DeHart's house, Woody started cutting the soles off his shoes. DeHart said, "No, you gotta burn them. You gotta

2

make them disappear." DeHart asked Hursey to get a bottle of lighter fluid from a nearby shelf. Hursey handed the bottle to Woody, who used the lighter fluid to set his shoes on fire in the backyard. DeHart picked up some gloves and hats and told Woody to burn those too because "he didn't know which ones had the gunpowder on them." The stolen marijuana was "dumped" on a table, and DeHart "told Woody to burn the plastic bag" because Thornburg's "prints would be on it."

Woody then emptied the black bag that DeHart had brought to Thornburg's house, and "a utility knife hit the table." Woody remarked, "Gee, the duct tape is missing." DeHart told him to look for it. Woody searched the car and said, "It's not out there." DeHart asked where it was, and Woody "said it's either in Thornburg's house somewhere or the alley." DeHart replied, "You're stupid, you're stupid . . . You just took two lives for an ounce of weed." Woody said that Thornburg was "getting too loud," and he thought that "she was going to wake up the grandma that was at the residence," so he "panicked and shot her." He also said that "the gun had jammed and that he had dropped all the rounds except for the last one on the floor," and "he shot Knisely in the head and saw his brains fly out with the last bullet." Woody said that he "couldn't stick to the original plan" because DeHart and Hursey "ran out of the house," so he "couldn't very well tape Thornburg up and slit her throat."

At 12:29 a.m., Thornburg called 911 and told the operator that Woody had "knocked her out and shot her boyfriend." Thornburg was still alive when police arrived, and she told them that Woody was the shooter. She later died from "a shock wave type trauma to the brain" as a result of the shooting. In her bedroom, police found a roll of duct tape, a glove, two nine-millimeter shell casings, and three live nine-millimeter rounds. That afternoon, police officers apprehended Woody at a gas station in a vehicle registered to DeHart's mother.

Hursey initially denied that he or the others were involved in the crimes, but he later told police where DeHart discarded his shoes and Woody discarded his handgun. Police searched the roadside and found a pair of shoes that were "similar in size, shape and tread design" to "impressions made in the snow" outside Thornburg's home "on the night of the shooting." Woody's handgun was never found. At DeHart's house, police found a pile of burned clothes and shoes, a bottle of lighter fluid, a utility knife, and DeHart's black bag.

3

The State charged DeHart with two counts of murder, alleging that he knowingly or intentionally committed or attempted to commit robbery, during which Thornburg and Knisely were killed. The State also charged DeHart with one count of level 6 felony obstruction of justice, alleging that he "burned the coat, gloves and shoes used in the crime of robbery and/or murder." The State charged Woody with two counts of murder, alleging that he knowingly or intentionally killed Thornburg and Knisely. The State also charged Hursey with murder.

The State filed a motion to join the defendants, which the trial court granted. DeHart filed a motion for a separate trial, which the trial court granted as to Hursey but denied as to Woody. DeHart and Woody's jury trial occurred in October 2016. Hursey testified for the State. Neither DeHart nor Woody testified. The jury found them guilty as charged.

ECF 10-6 at 2-7; DeHart v. State, 87 N.E.3d 54 (Ind. App. 2017).

Mr. DeHart's petition argues that he is entitled to habeas relief because his trial counsel provided ineffective assistance by failing to object to references to his criminal history, by failing to tender an instruction on accomplice liability, by failing to impeach Ashlyn Shepard, and by failing to object to rap song evidence.   He also argues that his appellate counsel provided ineffective assistance by failing to support the argument challenging the joint trial.

<u>STANDARD OF REVIEW</u>

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Woods v. Donald, 575 U.S. 312, 316 (2015) (quotations and citation omitted).

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on

4

the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

[This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Woods v. Donald, 575 U.S. at 316 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. Rose v. Clark, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quotation marks omitted).

To prevail on an ineffective assistance of counsel claim in the state courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. Strickland v. Washington, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690–691.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." Id. at 693. In assessing prejudice under Strickland "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). "On habeas review, [the] inquiry is now whether the state court unreasonably applied Strickland." McNary v. Lemke, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." Id.

DISCUSSION

Ineffective Assistance of Trial Counsel -- Criminal History

Mr. DeHart argues that he is entitled to habeas relief because trial counsel didn't object to references to his criminal history during Thomas Hursey's testimony. He maintains that the state court shouldn't have credited trial

6

counsel's explanation for not objecting during post-conviction proceedings as a reasonable strategic decision because it was a post-hoc rationalization.

At trial, the court granted a motion in limine to exclude Mr. DeHart's prior convictions and bad character traits. ECF 12-3 at 34, 45-47. For their primary witness, the prosecution presented Thomas Hursey, who testified:

**Prosecution:** How is that you know Kyle DeHart?

**Hursey:** 2013 and 14 we were incarcerated together.

* * *

**Prosecution:** What happened next?

**Hursey:** We left there and went to the BMV so [DeHart] could get an ID.

**Prosecution:** He didn't have a driver's license?

**Hursey:** I believe all he had was a prison-issued ID.

**Prosecution:** So you went to the BMV and got an ID?

**Hursey:** Yeah. He got a paper ID.

* * *

**Prosecution:** After talking with your parole officer then, did the police then talk to you again?

**Hursey:** Yes. When I was being booked in, they pulled me out again, and I lied to them again. I told them I was trying to get in the block with DeHart, and I wasn't ever planning on saying anything I was going to take the truth to the grave with me. I was prepared to do it. I told them to put me in the block with DeHart, that I'd get him to talk about it and I'd find out what they wanted to know. I lied to them at that point too. I got put in the block with DeHart and then after me and DeHart talked for a day or two about it, I believe he was in the shower or still sleeping, I got on the phone and called the detectives and told them I wanted to talk to them. They pulled me out. I had a brief discussion with my attorney.

* * *

**Prosecution:** Woody and DeHart pretty close?

**Hursey:** Yes.

**Trial Counsel:** Objection, speculation.

**The Court:** I'll overrule that.

**Prosecution:** How do you know that?

**Hursey:** The way they talk about each other. They speak very highly of each other. I know they've caught cases together.

**Trial Counsel:** Objection, Your Honor, move to strike. It's in the motion in limine.

**Prosecution:** I'll redirect with another question.

ECF 12-17 at 36, 42, 70-71, 81. At closing, Mr. DeHart's attorney argued:

> The defense case. As I told you and the court has told you, Kyle DeHart need not prove one thing. Don't have to prove a thing. But we did. We proved that Scott DeHart testified his son was in bed at 12:30 at night. I know we're going to hear, "Don't believe that," but he's not contradicted except by Hursey. So what does that mean? You've got to weigh the testimony of Scott DeHart versus the testimony of Thomas Hursey. Who is more credible, Thomas Hursey, who's the admitted liar, who has cut deals on various cases, has high hopes that he's cutting a deal on this case, is not here for trial and hasn't been tried for murder that we just heard the prosecutor say. He hasn't been convicted because they're cutting a deal. He's cutting a deal because he tried to get out of it.

ECF 12-20 at 59.

At the post-conviction stage, trial counsel testified:

**PCR Counsel:** During the course of the trial, do you recall whether any witnesses made reference during out testimony to Mr. DeHart's criminal history or time in jail or prison?

**Trial Counsel:** I don't remember.

**PCR Counsel:** Can you think of any specific reasons why you would not have objected if those references came up?

**Trial Counsel:** Sure. I'm speculating because I don't know if the references came up and if I'd felt that a jury wasn't impressed or didn't give much weight to the fact that there could've been some minor criminal indiscretions, I might not have wanted to draw attention to it. I mean, so without seeing it, I really can't tell you what my thought process was. But there are numerous things that occur during a trial that are objectionable that sometimes I don't objective because I just want to let it go by.

\* \* \*

**Prosecution:** So I asked Hursey, "How do you know Kyle DeHart?" He answered 2013 and 14, we were incarcerated together. Question: Through that period of time and knowing Kyle did you guys get close? Answer: Pretty close, yes. Really close actually. Objection?

**Trial Counsel:** I'm assuming I did not object.

**Prosecution:** That you did not?

**Trial Counsel:** Yeah, I wouldn't have objected because there I wanted to disparage Hursey. I want him in prison. I want him in jail. So that I can attack him and if I object and It's sustained, I'm not going to be able to go after Hursey on that.

\* \* \*

**Prosecution:** To continue my direct examination of  Thomas Hursey, Volume 3, Page 42, Line Thomas Hursey answered a question. We left there and went to the BMV so Kyle could get an ID. And I asked he didn't have a driver's license? And he said I believe all he had was a prison-issued ID. And then I asked, "So you went to the BMV and got an ID? Yeah, he got a paper ID. Why didn't you object to that.

**Trial Counsel:** Again, there was two aspects. I don't recall exactly how this played in but there was a wallet that was recovered during the police investigation and if memory serves me right there was a time issue between the issuance of the paper ID and the locating of the walle but I can't sit here right now and remember exactly how that connected up. I don't even remember how long ago this was. And the other part Hursey would end up in custody, our position was Hursey would end up in custody frequently and as a result of

that he would cut deals and flip on people. And our argument was that he's made this up. My argument to the jury was there was two people there at this killing. It was Woody and Hursey. I even had a witness who testified regarding hearing two doors slam and the car took off. So I wanted to place Hursey there, and I wanted as much garbage on Hursey as I could get.

**Prosecution:** Yes.

**Trial Counsel:** My client was saying, "I wasn't there." His father was saying he wasn't there that he was at home. I've got a witness saying there were only two witnesses there. I certainly didn't intend to muddy the waters with objections. My position was I don't care what he's done, this guy is trying to save his own case.

**Prosecution:** Hursey?

**Trial Counsel:** Yes.

**Prosecution:** And there was another reference to pretrial incarceration, and it was Volume 3, Page 70, Line 17. Where Hursey indicated when I was booked in, they pulled me out again, and I lied to them again. I told them I was trying to get in the block with DeHart, and I wasn't even planning on saying anything. I was going to take the truth to the grave with me. I told them to put me in the block with DeHart, that I'd get him to talk about it and I'd find out what they wanted to know. I got put in the block with DeHart and then after me and DeHart talked for a day or two about it. I believe he was still sleeping. Any objection to all that?

**Trial Counsel:** No.[1] I needed him to be able to have access to DeHart to show his bias. Why he's trying to cut his own deal to get out. How else is he going to talk to him if he's being put in jail if DeHart's not, I've got to establish that this guy is doing anything he can to cut a deal on his own cases and throw Kyle under the bus.

\* \* \*

**Trial Counsel:** I also didn't want to necessarily draw too much attention and look it was a troublesome matter.

---

[1] Contrary to trial counsel's testimony here, trial counsel objected to this testimony at trial, and the trial counsel sustained this objection as detailed above.

ECF 12-9 at 6-7, 16-19.

On appeal, the Indiana Court of Appeals rejected this claim finding that trial counsel's strategy of declining to object to the references to Mr. DeHart's criminal history was reasonable and wasn't deficient performance. ECF 10-13 at 17-20. The appellate court found that trial counsel's primary strategy was to persuade the jury to credit Scott DeHart's testimony about the alibi over Mr. Hursey's testimony by emphasizing Mr. Hursey's history of providing information to law enforcement in exchange for leniency in his criminal cases. Id. The appellate court reasoned that trial counsel relied on Mr. Hursey's testimony about his own criminal history and incarceration to impeach the testimony incriminating Mr. DeHart. Id. Trial counsel reasonably believed that the use of the information to impeach Mr. Hursey was worth the potential collateral damage to Mr. Dehart and that objecting may have served only to place greater emphasis on Mr. DeHart's criminal history. Id.

The court can't find that the State court made an unreasonable determination with respect to this claim. Trial counsel's primary strategy required him to discredit Mr. Hursey, which, in turn, required him to highlight Mr. Hursey's history of providing information to law enforcement in exchange for leniency with his criminal cases. Trial counsel's closing argument shows that the post-conviction testimony regarding trial strategy was not merely a rationalization after the fact. Some of Mr. Hursey's testimony on this topic was intertwined with testimony about Mr. DeHart's criminal history and pretrial detention, and a successful objection would have prevented trial counsel from

relying on such testimony during closing. Mr. DeHart's attorney objected on the sole occasion Mr. Hursey mentioned Mr. Dehart's criminal history without also mentioning his own.

Further, trial counsel's concern that an objection would serve only to emphasize Mr. DeHart's criminal history wasn't unreasonable. A successful objection would have resulted in the trial court instructing the jury to disregard the testimony, but the juries cannot simply erase their memories, see e.g., Bruton v. U.S., 391 U.S. 123, 129 (1968), and a trial counsel's objection in open court necessarily draws additional attention to information sought to be excluded. Courts presume that jurors follow judicial admonitions about evidence, but lawyers don't have to share that presumption. Mr. Hursey's references to Mr. DeHart's criminal history were relatively vague indicating, in passing, that Mr. DeHart had been in prison and then detained before trial but without any description of the crimes committed, any comment as to their severity, or any indication as to whether they were in any way similar to the crimes that were the subject of the trial.

Considering the high probative value of Mr. Hursey's testimony, the relative vagueness of the references to Mr. DeHart's criminal history, and the risk of placing even greater emphasis on these references, the court finds that the State court determination regarding deficient performance was reasonable. Therefore, this claim is not a basis for habeas relief.

Ineffective Assistance of Trial Counsel -- Accomplice Liability

Mr. DeHart argues that he is entitled to habeas relief because his trial attorney provided ineffective assistance by failing to request a "mere presence" instruction. He contends that such an instruction would have allowed the jury to find that he was at the scene of the crime but that he intended trick the victim into giving him the marijuana without payment rather than committing robbery through the use or threat of violence.

At trial, Mr. Hursey testified as follows:

**Prosecution:** What's the last time you remember seeing the black bag?

**Hursey:** That's the last time I seen it up to where we are right now.

**Prosecution:** Where are we?

**Hursey:** As far as us traveling back into town to get Woody.

**Prosecution:** Then you saw the bag again? The bag was in the car with woody?

**Hursey:** I hadn't seen it at that point, no. When we came into town --

**Prosecution:** In Syracuse?

**Hursey:** Yeah. [DeHart] tells me, he's like, " Hey, Tom," and I'm like, "Yeah?" He said, "Just so you know, we don't intend on paying for these trees.?

**Prosecution:** Trees. What's what?

**Hursey:** Another name for marijuana. Okay, I was like, "Alright, so what are you saying," and I really don't remember who said what, but it was established that they planned on rolling her. So basically talk her out of her weed, promise to pay her later, and no do it.

\* \* \*

**Prosecution:** The weed they had got from [the victim]?

13

**Hursey:** Yes. And after it was dumped on the table, [DeHart] told Woody to burn the bag that her prints would be on it. so that was taken and it was discarded and then there was the black bag that was in place at the time in the room that we was in, and Woody went to dump it out and a utility knife hit the table. He told [DeHart], he said, "Gee, the duct tape is missing." [DeHart] said, "What do you mean the duct tape is missing," and he said, "It's not here." [DeHart] said, "Well, where is it then?" He said, "Man, it's either in the car or the house or the alley." [DeHart] said, "You better go find it." [DeHart] had told him several times leading up to this, he was stupid, it didn't have to happen like that.

* * *

**Prosecution:** What's up with the utility knife and the tape. Did they ever talk about that that night?

**Hursey:** Yes, after [DeHart] had told Woody he was stupid, Woody said, "I couldn't stick to the original plan. She started screaming. I thought she was going to wake the grandma up. I panicked. I shot her." He said, "You guys ran out of the house." He said, " I couldn't very well tape her up and slit her throat, and I was worried the grandma was gonna get up. I shot the guy with the last bullet. I thought I was gonna have to slit the grandma's throat going down the steps."

ECF 12-17 at 48-49, 57-59.

In final argument, Mr. DeHart's attorney specifically addressed some of

the jury instructions, including Jury Instructions 12 and 13:

Where the Defendant reasonably should have foreseen that the commission of or attempt to commit the contemplated felony would likely create a situation which would expose another person to the danger of death, and where the death in fact occurs as was foreseeable, you may find that the creation of such a dangerous situation is a mediate contribution to the victim's killing.

* * *

Under Indiana law, the responsibility for any bodily injury which occurred during the commission or attempted commission of a robbery rests on the perpetrators of the crime, regardless of who inflicts the jury, so long as it is a natural and probable consequence

of the events and circumstances surrounding the robbery or attempt.

ECF 12-2 at 64-65.

On these instruction, trial counsel argued:

I wanted to discuss Instruction Number 12. Where the defendant reasonably should have foreseen that the commission of or an attempt to commit a contemplated felony would likely create a situation which would expose another person to the danger of death and where the death, in fact, occurs was foreseeable, you may find that the creation of the dangerous situation is a mediate contribution to the victim's killing. So, in other words, you've got to discuss foreseeability. The State's evidence was that nobody expected that gun to come out. They were going to trick her, remember, Thomas Hursey. That doesn't mean you kill somebody. That doesn't mean you beat them up. That doesn't mean you hurt them. You trick them. So it's not foreseeable. If you believe Hursey, Hursey and [DeHart] had no idea. We didn't know this was coming because we were just going to roll her. We were going to trick her. It's not foreseeable then. Again, my position is, [DeHart]'s not there. Instruction 13 references the natural and probable consequences of events. Again, it's very similar to the prior instruction. What is the natural and probable consequences of trying to trick someone? Again, my position is, DeHart is not there. But if you follow the State's evidence, this instruction they have failed to show the natural and probable consequences of a trick resulting in somebody getting shot.

ECF 17-20 at 61-62.

The jury instructions also included:

Before you may convict the defendant, Kyle David DeHart, the State must have proved each of the following beyond a reasonable doubt:

1. the Defendant, Kyle David DeHart;

2. killed;

3. [the victim]; and

4. while committing or attempting to commit robbery, which is defined as knowingly or intentionally taking property from another

person or from the presence of another person (1) by using or using threat of force on any person; or (2) by putting any person in fear.

\* \* \*

To "aid" under Indiana law is to knowingly aid, support, help or assist in the commission of the crime. It is knowingly doing some act to render aid to or act in concert with the perpetrator of the crime.

Proof of the defendant's presence at the crime scene, failure to oppose the commission of the crime, companionship with the person committing the offense, and conduct before, during and after the offense may be considered in determining whether aiding may be inferred.

ECF 12-2 at 59-60, 66.

Mr. DeHart argued at the post-conviction stage that his trial attorney should have requested a "mere presence" instruction to inform the jury that mere presence at the scene of the crime and knowledge that a crime is being committed aren't sufficient to allow an inference of participation. Mr. DeHart's trial attorney testified as follows:

**PCR Counsel:** Did you consider requesting the mere presence language to be included in any of the instructions in this case?

**Trial Counsel:** Absolutely not.

**PCR Counsel:** And would you have had a strategic reason for not wanting this language in any of the instructions?

**Trial Counsel:** Alibi was the defense that he was not there. That would've been conflicting argument in other words to say, "My client wasn't there but, if you don't believe that, then, if he was there, his mere presence didn't have anything to do with it. I think that's foolhardy with a jury. You need a clearer defense, and the defense from Mr. DeHart and his father was that he wasn't there, he was at home.

\* \* \*

**Prosecution:** Through the course of the representation of [DeHart], did you have opportunities from time to time on a regular basis to meet with your client and talk about possible defenses?

**Trial Counsel:** Yes, sir.

**Prosecution:** Did you and your client agree that alibi was your best defense?

**Trial Counsel:** That was the defense, he wasn't there. Right, yes. According to what I was told he was not there, and that was supported by an independent witness. So, I would say, yes, that probably is my best defense.

**Prosecution:** Okay, and so when it's brought up to you about the request of a mere presence instruction, that was actually contrary to the alibi?

**Trial Counsel:** Right, that's why I said absolutely not.

* * *

**Prosecution:** So would it even cross your mind to ask for a mere presence instruction?

**Trial Counsel:** No, it would be inconsistent, and it would, in my opinion, place my credibility at issue with the jury, and why would they believe anything I say then?

* * *

**PCR Counsel:** I'd like to refresh your memory on some of the arguments you made during closing.

**Trial Counsel:** Okay.

**PCR Counsel:** Volume 6, Page 62. If you believe Hursey, Hursey and [DeHart] had no idea. We didn't know this was coming because we were just going to roll her. We were going to trick her. It's not foreseeable then. Does that sound like an argument that, even if he was there, he didn't know that the robbery was going to happen?

**Trial Counsel:** Yes.

**PCR Counsel:** And would you think that the mere presence instruction then would've been helpful to support that part of your closing argument?

**Trial Counsel:** No, in that portion of the argument, you lay out your defense. I laid out my total defense. The one thing I need to make sure that I address is the State's argument that all three of these guys were there. And what I was doing there is saying, even if you believe Hursey, I don't want to spend a whole bunch of time, and I don't want to make that the thrust of my argument, but I've got to address it at least. And show them that, although the jury disagreed with me, the State's theory doesn't hold water because even Hursey's saying I didn't know this was going to happen. But [DeHart] and his father, [DeHart] didn't testify but his position to me and his father is that this guy's at home. I can't go make the argument that my client wasn't there, he was home asleep in bed, and, if you don't believe him or his dad, then he didn't have anything to do with it. Would some people make that argument? Yeah, maybe. But I don't think a reasonable criminal practitioner would damage their own credibility by making that argument. By picking on portion of the argument saying, if you believe Hursey, then I still win. That's not the same, in my opinion.

ECF 12-9 at 6, 13-15, 24-25.

The Indiana Court of Appeals rejected Mr. DeHart's post-conviction claim, finding that trial counsel's decision not to request a "mere presence" instruction constituted a reasonable strategic decision rather than deficient performance. ECF 10-13 at 21-25. The appellate court reasoned that the "mere presence" instruction was unnecessary given trial counsel's focus on the alibi defense. Id. The appellate court reasoned that requesting such an instruction would have conceded Mr. DeHart's presence at the scene and that the trial record contained ample evidence to rebut an argument that Mr. DeHart was merely present, including evidence that Mr. DeHart had brought robbery supplies to the victim's residence and altered or destroyed incriminating evidence. Id. The appellate court further reasoned that trial counsel's discussion of foreseeability in which

he summarized the prosecution's theory while reiterating the alibi defense was also a reasonable strategy. Id.

The court can't find that the state court made an unreasonable determination on this claim. To start, trial counsel's concern that the jury might be skeptical if presented with contradictory defenses was not unreasonable. Mr. DeHart essentially suggests that the defense strategy should have been, "I wasn't there. But, if I was there, I had no intention of robbing or murdering anyone." The second sentence weakens the first, which was the primary trial defense.

Greater reliance on a "mere presence" defense would have required the jury to choose to believe Mr. Hursey's testimony that Mr. DeHart had told him that the plan involved only trickery but to discount his testimony that Mr. DeHart and Mr. Woody had planned to use duct tape and a utility knife on the victims. It is unclear why the jury would have had credited one part of Mr. Hursey's testimony while disregarding another part.

Mr. DeHart argues that trial counsel's discussion of foreseeability suggests that his lawyer actually presented contradictory defenses at closing and so should have requested the "mere presence" instruction to support the second defense. True, trial counsel discussed foreseeability at closing, but the discussion was brief and focused on the lack of evidence showing that Mr. DeHart intended to rob the victims rather than an outright declaration that Mr. DeHart was present but lacked the requisite intent. And even during this brief discussion, trial counsel reiterated his position that Mr. DeHart simply was not present.

In this case's unique setting, the absence of a "mere presence" instruction didn't prejudice Mr. DeHart. The jury instructions read to the jury told the jury that something more than Mr. DeHart's mere presence had to be proven for a conviction. The felony murder instruction required the jury to find that Mr. DeHart knowingly or intentionally took property from the victims by using or using threat of force on any person. The "aid" instruction required the jury to find that Mr. DeHart knowingly did some act to render aid to or act in concert with the perpetrator of the crime. Evidence of Mr. DeHart's mere presence would not satisfy these requirements; only evidence showing Mr. DeHart's intent to commit or to assist in the commission of a robbery would suffice.

The state court didn't unreasonably find that trial counsel's strategy was to present only an alibi defense and did not unreasonably determine that this strategy was reasonable. Therefore, this claim is not a basis for habeas relief.

<u>Ineffective Assistance of Counsel -- Rap References</u>

Mr. DeHart argues that his trial counsel provided ineffective assistance by failing to object to the prosecution's reference to rap music at closing and by failing to request an admonition. He contends that that trial court would have sustained the objection and admonished the jury to disregard the reference.

At trial, the prosecution presented Nelson Blocher to testify about three rap songs performed Mr. DeHart and Mr. Woody performed. ECF 12-14 at 3-32. The prosecution sought leave to present this testimony along with audio recordings and transcripts of the lyrics. <u>Id.</u> at 10-11. Trial counsel objected on

20

the basis that the transcripts and the audio recordings were cumulative, that they were irrelevant to this case, and that the prejudice effect outweighed any probative value. Id. at 20-21. He noted that Mr. Blocher didn't know the authorship or date of creation for one of the songs and that another song had been written three years before the crime. Id. Mr. Woody's counsel lodged an objection on the basis that the songs amounted to inadmissible propensity evidence, which Mr. DeHart's counsel joined. Id. at 22-23. The prosecution responded that the rap songs were relevant to show motive and intent given their references to gun use, shots to the face, using duct tape on mouths, and marijuana. Id. at 23-25. The trial court allowed the prosecution to present the testimony and the audio recordings but excluded the transcripts as cumulative. Id. at 26-27.

The prosecution also presented John Vanderreyden to testify about a rap performance by Mr. Woody at a house party in which he loaded a gun as part of the performance. ECF 12-19 at 52-69. Mr. Woody's counsel objected on the basis that the testimony was unfairly prejudicial and amounted to inadmissible propensity evidence, and trial counsel joined in that objection. Id. at 57-58. The trial court allowed the prosecution to present the testimony. Id.

At closing, the prosecution explained the significance of the rap evidence as follows:

> Let's not forget some of Woody and DeHart's actions that show motive, intent, and consciousness of guilt. The rap song lyrics give us a foreboding and also a glimpse of Woody and DeHart's fantasies by singing about them. *What's Beef* starts out with woody rapping gunshots "pop pop." Then rap lyrics consisting of, "When that bullet leaves its 9, you gonna be the one deceased; type to shoot you in

your fuckin' face; beat so raw, head ringin' from the base; ain't no goin' back you could get smoked like crack; you think you're tough shit but I'ma show you what you lack; put a pistol in your face, have you staring at the mack; pistol whip a bitch, have you ringin' like a bell; tell me homey I said what's up when he greet you in hell." Then Woody and DeHart rapped a song that's called *Or Naw*, where the lyric is rapped as, "Talk too much, I'll duct tape your mouth; 9 milly milly gotta date with you; leave your face, chopped and screwed; take ya dough, I'm hella rude." And we hear a rap song by DeHart, "would give a fuck cuz I'll bust you fuckin' tooth; no weed, grab week, take it to the death; wouldn't give a fuck, what you talkin' 'bout my nigga; wouldn't give a fuck, he pull the fuckin' trigger." And Woody's rap performance in December 2014, where he was seen dancing with a semi-automatic that he attempted to load but misfed. And he wears it in a hidden fashion underneath his pants.

ECF 12-20 at 31-32.

In response, Mr. DeHart's attorney argued:

Nelson Blocher talking about the rap songs. The State believes that this is somehow motive. I struggle to comprehend how this is motive. Especially relative to [DeHart]. [DeHart] doesn't write the songs. He's present on two recordings. The rapper we heard was Woody and, according to the State's own evidence, Woody's the one that did this. So playing rap or liking rap music does not make one a killer. It has nothing to do with this. It definitely has nothing to with this relative to Kyle DeHart.

Id. at 57-58.

In rebuttal, the prosecution argued:

Rap songs, totally agree. I listen to Glenn Miller. I'm not as old as my grandfather, but I love Glenn Miller. Rap songs, just because you like rap songs doesn't mean you're a killer. But if you make your rap songs and you put in your own lyrics, you're kinda telling us what kind of person you are that will commit this type of a crime and tell us specifics in the lyrics, and they lived it out. They actually lived out their fantasy. Isn't that sick? These guys are wired differently because of that.

Id. at 71.

Mr. DeHart argued on direct appeal that the trial court erred in admitting the rap song evidence. ECF 10-3 at 25-28. The Indiana Court of Appeals held that the rap song recordings should have been excluded as unfairly prejudicial but that there was no substantial likelihood that the evidence contributed to Mr. DeHart's convictions. ECF 10-6 at 10-19. The appellate court determined that the testimony regarding Mr. Woody's rap performance was admissible because it showed that Mr. Woody possessed a semiautomatic handgun with a feeding mechanism that jammed consistent with Mr. Hursey's account of the shootings. Id.

At the post-conviction stage, trial counsel testified as follows:

**PCR Counsel:** Do you recall the State referencing the rap songs that were placed into evidence during their closing argument?

**Trial Counsel:** Yes.

**PCR Counsel:** Did you consider objecting to these references?

**Trial Counsel:** I objected several times to the rap songs, and I believe even on appeal the Court of appeals agreed with me and said it should not have occurred but it was not reversible error. So yes and yes.

**PCR Counsel:** Did you recall whether you considered a limited instruction for the jury during closing arguments?

**Trial Counsel:** I don't like limiting instructions because limiting instructions say hey, don't scratch your nose, and then people just start scratching their nose. So I made my objection. I was overruled. The Court of Appeals agreed with me, but I wasn't going to drive it home that this really hurt us so bad even though it was a song. So no I didn't.

ECF 12-9 at 8-9.

23

On the post-conviction appeal, the Indiana Court of Appeals rejected this claim, finding that trial counsel's decision to not object to the reference to rap songs in the rebuttal was a reasonable strategic decision given the trial court's rulings on earlier objections to the rap evidence. ECF 10-13 at 29-34. The appellate court also found that trial counsel's objection would not have been sustained because these references were a direct response to trial counsel's closing argument. Id. Additionally, the appellate court found no prejudice given the overwhelming evidence against Mr. DeHart. Id.

The state court didn't make an unreasonable determination on the claim. Mr. DeHart contends in the traverse that "[a]n objection by trial counsel would have been sustained" and that "[i]f trial counsel would have requested for an admonishment and limiting instruction, it would have been granted." But Mr. DeHart makes no effort to reconcile this contention with the trial court's prior rulings that the rap evidence was neither irrelevant nor unfairly prejudicial or that the references in the rebuttal argument were a direct response to trial counsel's argument. "Only in a rare case will a court find ineffective assistance of counsel based upon a trial attorney's failure to make an objection that would have been overruled under the then-prevailing law." Hough v. Anderson, 272 F.3d 878, 898 (7th Cir. 2001); see also Carter v. Douma, 796 F.3d 726, 735 (7th Cir. 2015) ("His performance was not deficient by failing to make a futile objection."). In sum, trial counsel's decision not to raise a futile objection wasn't deficient performance and wouldn't have been likely to affect the outcome of the case, this claim is not a basis for habeas relief.

<u>Ineffective Assistance of Trial Counsel -- Failure to Impeach Ashlyn Shepard</u>

Mr. DeHart argues that he is entitled to habeas relief because trial counsel failed to impeach Ashlyn Shepard with her pending criminal charge and the plea deal offered for her testimony.

Ms. Shepard testified at trial that she is the mother of Mr. DeHart's child. Mr. DeHart called the day after the murders and asked if he could visit his daughter at her Mishawaka home, which was a normal occurrence. He arrived in his vehicle at around noon. When she asked what had happened with Mr. Woody, he replied only that he had tried to contact Mr. Woody but couldn't get a response. The police arrested Mr. DeHart at her house that day. Ms. Shepard falsely told the police that she was with Mr. DeHart at the time of the murders. <u>Id.</u> She explained at trial that she had falsely told her grandmother that she spent the night with him to conceal her underaged drinking and lied to the police in to be consistent with her lie to her grandmother. She identified the shoes purportedly worn and thrown away by Mr. DeHart on the night of the murders as belonging to Scott DeHart.

On cross-examination, Ms. Shepard acknowledged that she was on the verge of tears. She also admitted that she recognized the shoes as merely being the same style of shoe worn by Scott DeHart -- white New Balances -- and that she was only 85 percent certain of her identification.

At the post-conviction stage, trial counsel testified as follows:

**PCR Counsel:** At the time of trial, were you aware that State's witness Ashlyn Shepard had pending criminal charges?

**Trial Counsel:** Was that his girlfriend?

**PCR Counsel:** Yes.

**Trial Counsel:** I think I did know at the time of trial that she had something pending but as I sit here right now, I can't recall if it was related to this or like an obstruction or shoplifting. I just don't remember. I don't think it was a significant criminal matter.

**PCR Counsel:** And do you recall whether you questioned her about the pending charges during her testimony?

**Trial Counsel:** Don't recall.

**PCR Counsel:** And can you think of a specific reason why you might not have brought that up during her testimony?

**Trial Counsel:** Well, one, it might not be relevant, but without refreshing my recollection as to pending charges and what those were, I can't tell you?

**PCR Counsel:** If the charges were relevant, would there have been a strategic reason not to bring it up during her testimony?

**Trial Counsel:** Sure, if it doesn't assist.

* * *

**Prosecution:** And so then moving onto another issue that was raised was Ashlyn Shepard. Ashlyn Shepard was the girlfriend, the mother of [DeHart's] child, and I noticed in the cross-examination you had with Ashlyn, Volume 5, Page 184, Line 9. That you indicated to her that you spoke to her prior to her testimony and that she was emotional.

**Trial Counsel:** That's correct. I remember that.

**Prosecution:** Do you remember what when she took the stand, and I was doing direct exam of her, I Some of the foundation that I laid was Ashlyn is the mother of [DeHart's] child. I did, I laid that. That would be Volume 5 around Page 180. Page 132, Ashlyn admitted that she lied to the police.

**Trial Counsel:** Right.

**Prosecution:** Which was part of the charge that was pending on her.

**Trial Counsel:** Okay.

**Prosecution:** When she said that [DeHart] was with her because she told her grandma that she was going to be with [DeHart] when in fact she went out drinking.

**Trial Counsel:** Yes
.
**Prosecution:** So she admitted that she lied.

**Trial Counsel:** Yes.

**Prosecution:** And then on direct examination, this might've surprised you, when Ashlyn admitted or Ashyln identified the tennis shoes, but she thought that they were Scott DeHart's tennis shoes.

**Trial Counsel:** Correct.

**Prosecution:** And you were probably like catching that's for me. That was good for your case, right?

**Trial Counsel:** Correct. Well, I would've preferred that she didn't know whose shoes they were, but they were not attributed to [defendant Kyle DeHart], that's correct.

**Prosecution:** So then on cross-exam, you first laid the basis that she spoke to you before the testimony that she was emotional. On Line 13 on Page 184, Line 5, "You told me you were going to cry."

**Trial Counsel:** Right.

**Prosecution:** Page 184, Line 18, Page 185, Line 12. Ashlyn says that Scott DeHart wears New Balance shoes. She thinks she's seen the shoes but she has never seen [defendant Kyle DeHart] wearing those shoes.

**Trial Counsel:** Right.

**Prosecution:** And she is only 85 percent sure that Scott DeHart wore shoes like that.

**Trial Counsel:** Right.

**Prosecution:** She's more of a witness now for you than she is for me. Why would you beat up on her if that's the case and then in the

post-conviction relief it's saying that you failed to impeach her. Why would you have beat up on her?

**Trial Counsel:** Oh, okay, you have refreshed my memory. When I met with Ashlyn prior to her testimony, she just sobbed constantly, and I was very concerned that when she got up here, she would do the same thing and just sob relentlessly and have the jury upset that we were picking on the mother of his child. And but in case I'm forgetting something I'm sure counsel will let me know but yeah if she's not even sure that those shoes are in DeHart's house, she really doesn't hurt me that bad. I can't remember if there was a portion of her testimony that really hurt.

**Prosecution:** I'm giving you pretty much the hit.

**Trial Counsel:** Then no I wouldn't impeach her. Why, just to impress the court reporter?
No.

**Prosecution:** You may not recall this or you may, she was on the stand very short.

**Trial Counsel:** I do recall it being a short witness.

**Prosecution:** But this trial went several days, and we had several witnesses, right?

**Trial Counsel:** I think we went four or five days.

**Prosecution:** Yes. And through the course of all the presentation of those witnesses, Ashlyn Shepard was pretty much the only witness that humanized [DeHart], right. Made him good that he's a father. Made him food that he takes care of his kid. Makes sure that he visits the child regularly. She humanized him. She made him look good in front of the jury, yes?

**Trial Counsel:** I think his dad did too. But other than that, yes.

**Prosecution:** Yes.

**Trial Counsel:** I mean, there wasn't any other witness from the state's side that was beneficial to us. That's true.

**Prosecution:** Right, so if you would attack her on the stand, is it possible that the jury could see that you're demonizing her?

**Trial Counsel:** That's possible. I was more concerned that they would hold it against [DeHart] if I jumped on the mother of his child. But assuming you guys have shared everything with me, the gist of her testimony, there is no basis to impeach her anyways. What, she didn't hurt me at all.

* * *

**PCR Counsel:** Do you think if the jury knew that she had pending charges connected to this case that that would change the way they saw her testimony and weighed her testimony?

**Trial Counsel:** No, I don't think so. Well, let me rephrase that. Balancing the fact that she was a basket case when I talked to her before, and I didn't want that to happen here because there was no way I was going to keep her out of this courtroom. And not wanting her to explode into a bunch of emotion and not knowing what was going to happen regarding the way she presented herself, I did not want to go beating on her over you lied for your boyfriend.

ECF 12-9 at 7-8, 21-23, 26.

The Indiana Court of Appeals rejected this claim on the post-conviction appeal, finding lack of deficient performance and lack of prejudice. ECF 10-13 at 25-29. The appellate court reasoned that the jury knew of the conduct underlying Ms. Shepard's criminal charge if not the criminal charge itself. Id. The appellate court further reasoned that trial counsel's decision to not risk alienating the jury by harshly questioning Ms. Shepard constituted a reasonable strategy given the low probative value of her testimony and given that she had already damaged her credibility by admitting that lied to the police and her grandparents. Id.

The state court of appeals made an unreasonable decision on this claim. A witness with a pending criminal charge might have a greater incentive to produce inculpatory testimony than a witness who has committed a criminal act

but has not been charged. But the record shows that trial counsel declined to pursue this line of inquiry based on Ms. Shepard's fragile emotional state, the limited inculpatory value of her testimony, its potential humanizing effect, and the presence of other testimony suggesting her dishonesty. And, contrary to Mr. DeHart's allegation, the record contains no evidence that the prosecution offered Ms. Shepard a plea deal. Given these circumstances, the state courts didn't unreasonably determine that trial counsel's decision to not raise Ms. Shepard's pending criminal charges was a reasonable strategic decision. This claim isn't a basis for habeas relief.

## Ineffective Assistance of Trial Counsel -- Cumulative Effect

Mr. DeHart argues that even if no individual error by trial counsel was prejudicial enough for habeas corpus relief, the court should grant him relief based on the cumulative prejudice of all of the errors by trial counsel combined. "[P]rejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." Malone v. Walls, 538 F.3d 744 (7th Cir. 2008).

As already detailed, each of the decisions Mr. DeHart challenges constituted reasonable strategy rather than deficient performance. The court further observes that evidence at trial strongly suggested Mr. DeHart's guilt. The victim identified Mr. Woody as the shooter to the emergency dispatcher. Mr. Hursey testified that Mr. DeHart was present when the shooting occurred and

that Mr. DeHart and Mr. Woody planned to commit a robbery and murders, although the initial plan involved the use of duct and a utility knife rather than a firearm. Other evidence corroborated Mr. Hursey's testimony, including the testimony of other witnesses that Mr. DeHart and Mr. Woody were together before and after the time of the crime, that duct tape was found in the room where the attempted robbery occurred, that a utility knife and a black bag that had contained the robbery tools was found in Mr. DeHart's residence, and that Mr. Woody had a large bag of marijuana the morning after the murders.

Mr. Hursey also testified that Mr. Woody and Mr. DeHart destroyed or tried to destroy evidence, which was similarly corroborated by testimony that shoes worn by Mr. DeHart were found in a snowy field and that the presence of fire remnants and burned clothing were found at Mr. DeHart's residence. Given the lack of deficient performance as well as the substantial evidence suggesting Mr. DeHart's guilt, this claim is not a basis for habeas relief.

## Ineffective Assistance of Appellate Counsel

Mr. DeHart claims entitlement to habeas relief because appellate counsel argued that the trial court should have granted the motion for a separate trial but failed to support the argument with appropriate legal authority and citations to the evidentiary record. He contends that the outcome of the appellate proceedings would have been different if appellate counsel had relied on Bruton v. United States, 391 U.S. 123 (1968), and the rap songs attributable to Mr.

Woody. The Strickland analysis also applies to claims of ineffective assistance of appellate counsel. Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986).

On direct appeal, appellate counsel relied on State procedural law when arguing that Mr. DeHart should have been granted a separate trial. The Indiana Court of Appeals rejected this argument on several grounds, including appellate counsel's failure to cite legal authority to support the contention that "[Mr. DeHart] was prejudiced by the introduction of evidence against Woody which would not be admissible in a trial against DeHart alone." ECF 10-6 at 8-10.

Mr. DeHart seized on the language from the appellate opinion to argue at the post-conviction stage that appellate counsel should have relied on Bruton and the rap songs attributable to Mr. Woody to support the argument on direct appeal that Mr. DeHart should have been granted a separate trail. The Indiana Court of Appeals rejected this post-conviction argument, finding a lack of prejudice. ECF 10-13 at 34-39. The appellate court reasoned that Bruton protects co-defendants from the testimonial confessions of other co-defendants but that Mr. Woody's rap songs weren't testimonial. Id. According to the appellate court, a Bruton argument wouldn't have been successful. Id.

The court can't find that the state court's determination of this claim was unreasonable. In Bruton, the Supreme Court of the United States considered the interplay between the Confrontation Clause and the right against self-incrimination in joint criminal trials when one co-defendant declines to testify at trial and his confession is used against a second co-defendant. Succinctly, the problem is that the second co-defendant can't exercise his right to confront his

co-defendant accuser without the first co-defendant also relinquishing their right against self-incrimination. In more recent years, the Supreme Court held that the Confrontation Clause relates solely to testimonial statements. Davis v. Washington, 547 U.S. 813, 824 (2006). A statement is testimonial if the primary purpose is "to establish or prove past events potentially relevant to later criminal prosecution," or to "create a record for trial." Id.; Michigan v. Bryant, 562 U.S. 344, 358 (2011).

The prosecution presented audio recordings of three rap recordings and eyewitness testimony of a rap performance. There is little context for the recorded rap performances or for the authorship of the lyrics; the prosecution sought to establish only that Mr. Woody and Mr. DeHart wrote and performed them at some undefined amount of time before the date of the murders. The foundational witness was able to testify only that one of the songs was written three years earlier, and the lyrics themselves are vulgar, nebulous, and don't resemble testimony in any fashion. The eyewitness testimony regarding the rap performance also does not resemble testimony -- according to the witness, Mr. Woody performed a rap song with undiscernible lyrics at a house party on December 13, 2014, three months before the murders. In sum, there is no indication in the record that the rap songs were in any way intended to prove past events for a criminal prosecution or to create a record for trial.

Consequently, had appellate counsel relied on Bruton on direct appeal to argue that the rap evidence shouldn't have been admitted, he wouldn't have been

successful. Therefore, the claim regarding appellate counsel is not a basis for habeas relief.

CERTIFICATE OF APPEALABILITY

Under Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c). For the reasons explained in this order, there is no basis for encouraging Mr. DeHart to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on August 19, 2022

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT